UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BERNARDO MENDIA,

    Plaintiff,

v.

JOHN M. GARCIA, et al.,

    Defendants.

Case No. 10-cv-03910-MEJ

**ORDER RE: MOTION TO DISMISS THIRD AMENDED COMPLAINT**

Re: Dkt. No. 119

## INTRODUCTION

Pending before the Court is individual-capacity Defendants John M. Garcia and Ching Chang's (collectively, "Defendants") Motion to Dismiss Plaintiff Bernardo Mendia's Third Amended Complaint ("TAC") pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Dkt. No. 119. Plaintiff filed an Opposition (Dkt. No. 128), and Defendants filed a Reply (Dkt. No. 130). Having considered the parties' positions, relevant legal authority, and the record in this case, the Court **DENIES** Defendants' Motion for the reasons set forth below.

## BACKGROUND

**A.**    **Factual Background**

The following factual background is taken from Plaintiff's TAC. Dkt. No. 110. Plaintiff is a United States citizen of Hispanic origin who acquired derivative United States citizenship in 1987 through his mother. *Id.* ¶ 1. On May 9, 2007, Plaintiff was arrested and charged with financial crimes; he proceeded to seek assistance from a bail bondsman to secure his release from pretrial detention. *Id.* ¶¶ 20-24.

On June 15, 2007, Defendants Garcia and Chang, Immigration and Customs Enforcement ("ICE") agents, selected Plaintiff for questioning, which Plaintiff alleges is because he is foreign-

born, appears to be of Mexican descent, and has a name indicating he is of Mexican descent. *Id.* ¶¶ 25-26.  Plaintiff alleges Defendants, as agents of the federal government, had full access to the United States Department of State's records as well as other government databases and information and should have known that Plaintiff was in fact a United States citizen. *Id.* ¶¶ 31-33. Among other things, Plaintiff had previously been issued two United States passports and an official California identification card. *Id.* ¶¶ 32-33.

As soon as the questioning began, Plaintiff stated in English that he was a United States citizen, gave Defendants his full social security number, told them he had a United States passport last issued in 1997, and said that his mother was also a United States citizen. *Id.* ¶ 39.  After making those statements, Plaintiff informed Defendants he was represented by the Contra Costa County Public Defender's Office and any further questions should be addressed to his attorney of record. *Id.* ¶ 40.  Plaintiff proceeded to invoke his Fifth Amendment right to remain silent. *Id.* ¶ 41.  Garcia then allegedly said something to the effect of "Oh! You don't want to talk?" *Id.* ¶ 42. Plaintiffs responded with silence and a horizontal shake of his head affirming his assertion to remain silent. *Id.* ¶ 43.  Garcia then said something to the effect of "We'll see if you want to talk when we're deporting your ass!" *Id.* ¶ 45.  At no time did Defendants inform Plaintiff he had the right to remain silent or that he had a right to have an attorney present. *Id.* ¶ 34.

Defendants placed an immigration detainer pursuant to federal regulation 8 C.F.R. § 287.7[1] on Plaintiff that same day. *Id.* ¶ 46; *see* Defs.' Req. for Judicial Notice ("RJN"), Ex. C (immigration detainer, stamped "Hold"), Dkt. No. 85.[2]  The detainer stated ICE had initiated an investigation to determine whether Plaintiff was subject to removal. *Id.*  According to Plaintiff, in 1985, the Immigration and Naturalization Service ("INS") entered into a settlement agreement for a class action lawsuit that memorialized and defined the correct application and use of ICE

---

[1] An immigration detainer generally advises a federal, state, or local law enforcement agency "that the Department [of Homeland Security ("DHS")] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). The detainer requests the agency notify DHS before the alien's release such that DHS can arrange to take custody over the alien. *Id.*

[2] The Court previously took judicial notice of the documents cited herein from Defendants' RJN. *See* Order re: Mot. to Amend ("MTA Order") at 4-6, Dkt. No. 107.

detainers.  TAC ¶ 47.  Specifically, INS (now part of ICE) acknowledged that an "immigration hold" may only be authorized by an officer of INS (now an ICE agent) when such officer has determined that there is probable cause that the person to be held is (i) an alien, (ii) is in the United States in violation of immigration laws, and (iii) is likely to escape before a warrant can be obtained for his arrest.  *Id.*  Plaintiff alleges Defendants had no grounds to believe he was an alien on June 15, 2007.  *Id.* ¶ 48.

Plaintiff alleges all of the bail bondsmen he spoke with informed him that no bail bond would be afforded on account of the ICE detainer lodged against him.  *Id.* ¶¶ 52-53.  He further alleges the ICE detainer curtailed his ability to petition the state court for a grant of own recognizance release or for a bail reduction.  *Id.* ¶ 58.  In any event, Plaintiff alleges that even if he received the requested relief, the ICE detainer stated ICE intended to assume custody of Plaintiff upon his availability for "pick-up."  *Id.*  Plaintiff also alleges the ICE detainer prevented him from engaging in fruitful negotiations with state prosecutors because any plea would be contingent on Plaintiff being granted probation.  *Id.* ¶ 60.

On January 8, 2008, Plaintiff had a chance encounter with Garcia and showed Garcia a copy of his 1987 certificate of citizenship.  *Id.* ¶ 68.  He complained to Garcia about the ICE detainer, and Garcia allegedly told Plaintiff that "this better check out," and "if it does, I'll follow up with you."  *Id.*  That same day, and allegedly unbeknownst to Plaintiff, Garcia issued a second detainer.  *Id.* ¶¶ 62, 69; RJN, Ex. D (immigration detainer).  This detainer was stamped with the words "Drop Hold" and was marked "Please cancel the detainer previously placed by this Service on 06-15-2007."  TAC ¶ 69; RJN, Ex. D.  But it also contained checked boxes stating that an investigation had been initiated to determine if Plaintiff was subject to removal from the United States and requesting Plaintiff be detained so that ICE agents could assume custody of him.  *Id.*  Plaintiff also alleges the January 8 Detainer indicates his nationality was Mexican.  *Id.*  Plaintiff alleges he was not aware of the January 8 Detainer, and no Defendant informed Plaintiff of it.  *Id.* ¶¶ 70-72.  Additionally, after the January 8 meeting with Garcia, Plaintiff alleges he contacted bail bond companies, which again told him that he had an ICE detainer placed on him.  *Id.* ¶ 73.

Om July 31, 2009, the state court *sua sponte* granted Plaintiff release on his own

United States District Court
Northern District of California

3

recognizance. *Id.* ¶ 77. Plaintiff informed the court that "something else" may have be preventing his release, at which point the judge had his courtroom deputy inquire as to what other "holds" may have been on Plaintiff. *Id.* The judge informed Plaintiff that there were no holds pending. *Id.* Plaintiff was released from custody that same day. *Id.* ¶ 79.

**B.     Procedural Background**

Plaintiff submitted an administrative tort claim to DHS on June 9, 2009, which the agency denied on March 1, 2010. *Id.* ¶ 7. On August 31, 2010, Plaintiff, proceeding pro se, filed his initial Complaint against Garcia and DHS, alleging constitutional and tort claims arising out of the detainer Garcia placed on him. Dkt. No. 1. Plaintiff, still proceeding pro se, then filed his First Amended Complaint ("FAC") on August 11, 2011, in which he (1) added Chang as a defendant; (2) asserted claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for violations of his constitutional rights to due process, equal protection, and right to bail; and (3) asserted claims under the Federal Tort Claims Act ("FTCA") for false imprisonment, malicious prosecution, abuse of process, negligence, and negligent infliction of emotional distress. Dkt. No. 28.

Defendants filed a Motion to Dismiss Plaintiff's FAC (Dkt. No. 34), which the Court granted on the grounds that Plaintiff lacked Article III standing (Dkt. No. 51). Plaintiff appealed the Court's dismissal of the action (Dkt. No. 52), and on April 8, 2014, the Ninth Circuit reversed, holding Plaintiff could show that Defendants caused his injury and thus had standing to sue. *See Mendia v. Garcia*, 768 F.3d 1009 (9th Cir. 2014).

On December 17, 2014, the Court granted Plaintiff 90 days to obtain counsel and seek leave to file a second amended complaint. Dkt. No. 63. Plaintiff timely sought leave on March 10, 2015 (Dkt. No. 64) and filed his Second Amended Complaint ("SAC"), again proceeding pro se, on April 1, 2015 (Dkt. No. 68). Defendants then moved to dismiss Plaintiff's SAC. United States and Official-Capacity Defendants' Motion to Dismiss, Dkt. No. 87; Individual Agent Defendants' Motion to Dismiss ("Agents MTD"), Dkt. No. 90. Plaintiff subsequently obtained counsel (Dkt. No. 93) and filed Oppositions to both Motions to Dismiss (Dkt. Nos. 96, 98). Thereafter, the parties notified the Court that Plaintiff intended to seek leave to file a third

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1   amended complaint and filed a Stipulation to "suspend" the briefing deadlines related to the

2   Motions to Dismiss "pending a decision on Plaintiff's Motion for Leave to File a Third Amended

3   Complaint." Dkt. No. 99. The Court granted the Stipulation. Dkt. No. 100.

4   In seeking leave to file a third amended complaint, Plaintiff sought to assert 11 new claims,

5   including (1) FTCA claims against the United States for negligence, negligent infliction of

6   emotional distress, and abuse of process; (2) *Bivens* claims against Chang and Garcia in their

7   individual capacities for violations of his Fourth Amendment right against unreasonable seizure,

8   Fifth Amendment right to equal protection, First Amendment right to freedom of speech, and

9   Eighth Amendment right against excessive bail; and (3) claims for equitable relief under the

10  Declaratory Judgment Act against all named Defendants for violations of his First Amendment

11  right to freedom of speech, Fourth Amendment right against unreasonable seizure, Fifth

12  Amendment right against self-incrimination, and Eighth Amendment right against excessive bail.

13  Proposed TAC ¶¶ 110-19, 131-54, 160-76, 183-88, 197-224, Dkt. No. 101-1. Plaintiff also sought

14  to add a new defendant, ICE Field Office Director Timothy Aitken. *Id.* ¶ 14; Mot. to Am. at 1.

15  The Court granted Plaintiff's Motion to amend his FTCA intentional infliction of

16  emotional distress, false imprisonment, and negligence claims, as well as his *Bivens* claims against

17  Chang and Garcia in their individual capacities as to his First Amendment, Fourth Amendment,

18  and his Fifth Amendment equal protection claims. *See* MTA Order, Dkt. No. 107. However, the

19  Court denied Plaintiff's Motion to file the proposed TAC as written for (1) his FTCA claims for

20  negligent infliction of emotional distress and abuse of process, (2) his Fifth Amendment

21  substantive due process and self-incrimination claims, (3) his Eighth Amendment *Bivens* claim,

22  (4) his Declaratory Judgment Act claims, and (5) his request to add Timothy Aitken as a

23  defendant. *Id.* As the Court's MTA Order dealt with many of the arguments raised in

24  Defendants' Motions to Dismiss the SAC, the Court terminated those Motions. *Id.* at 43.

25  Plaintiff timely filed his TAC on March 10, 2016. Dkt. No. 110. Defendant United States

26  of America filed an Answer to the TAC on March 28, 2016. Dkt. No. 123. Defendants Chang

27  and Garcia filed their Motion to Dismiss on March 21, 2016. Dkt. No. 119.

28  Defendants challenge Plaintiff's claims against them on two grounds. First, Defendants

contend they are entitled to qualified immunity, specifically on (1) Plaintiff's Fourth Amendment claim based on the issuance of the Detainer (Mot. at 12-15); (2) his First Amendment claim based on the alleged issuance of the Detainer for Plaintiff's refusal to speak (*id.* at 16-17); and (3) his Fifth Amendment Equal Protection claim (*id.* at 19-20).  Second, they challenge the application of *Bivens* to these claims.  *Id.* at 2.  Defendants acknowledge the Court previously ruled on their arguments about whether to imply a *Bivens* remedy in this case, but nonetheless assert they are "incorporat[ing] those arguments by reference for the purpose of preserving their ability to appeal adverse *Bivens* claims from a single order."  *Id.*  Additionally, they explain that "because the Supreme Court has never recognized a First Amendment claim under *Bivens*, additional special factors arguments not addressed by this Court in its earlier order foreclose Plaintiff's newly pled First Amendment claim in this unique context."  *Id.*  In response, Plaintiff contends the Court has already addressed Defendants' arguments in ruling on his Motion for Leave to File a Third Amended Complaint and that qualified immunity is unavailable to the Defendant Agents because Plaintiff has adequately pled constitutional violations of his clearly established rights.  *See* Opp'n.

## LEGAL STANDARD

Rule 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citation omitted).

A court may dismiss a complaint under Rule 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face.  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 557).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a

United States District Court
Northern District of California

United States District Court
Northern District of California

1    cause of action will not do.  Factual allegations must be enough to raise a right to relief above the

2    speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals omitted).

3         In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as

4    true and construe them in the light most favorable to the plaintiff.  *Id.* at 550; *Erickson v. Pardus*,

5    551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).  In

6    addition, courts may consider documents attached to the complaint.  *Parks Sch. of Bus., Inc. v.*

7    *Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) (citation omitted).

8         If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no

9    request to amend the pleading was made, unless it determines that the pleading could not possibly

10   be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en

11   banc) (internal quotations and citations omitted).  However, the court may deny leave to amend for

12   a number of reasons, including "undue delay, bad faith or dilatory motive on the part of the

13   movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice

14   to the opposing party by virtue of allowance of the amendment, [and] futility of amendment."

15   *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v.*

16   *Davis*, 371 U.S. 178, 182 (1962)).

17                                        **INITIAL OBJECTIONS**

18        As an initial matter, Plaintiff takes issue with two primary aspects of Defendants' briefing:

19   (1) Defendants' reliance on their reference to earlier arguments in their briefing to dismiss

20   Plaintiff's SAC, which both seems to be an attempt to have the Court reconsider some of its earlier

21   determinations and further to improperly increase the page limit permitted for motions under Civil

22   Local Rule 7; and (2) Defendants' overuse of footnotes.  Opp'n at 2-5.  There is some merit in

23   both of Plaintiff's objections, but ultimately the Court does not see fit to issue sanctions (and

24   Plaintiff does not specifically seek them).  Nonetheless, the Court admonishes Defendants to be

25   careful not to overuse footnotes for the parties' and the Court's benefit.  Second, as to Defendants'

26   reliance on past arguments, the Court deals with them below and finds no prejudice to Plaintiff as

27   a result of Defendants' reliance on their earlier arguments.  Consequently, the Court turns to the

28   substantive arguments raised by the parties.

**DISCUSSION**

In the following discussion, the Court first addresses whether Defendants are entitled to qualified immunity before turning to Defendants' *Bivens* arguments.

**A.      Qualified Immunity**

1.      <u>Legal Standard</u>

"[T]he qualified immunity analysis is identical under either [42 U.S.C. § 1983 or *Bivens*] cause[s] of action." *Wilson v. Layne*, 526 U.S. 603, 609 (1999). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a . . . constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). An official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011). In making this determination, courts consider the state of the law at the time of the alleged violation and the information possessed by the official to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007). "[T]he salient question . . . is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged [conduct] was unconstitutional." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quotation omitted). Courts exercise their sound discretion in deciding which prong of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case. *al-Kidd*, 131 S. Ct. at 2080.

"The plaintiff bears the burden of proof that the right allegedly violated was clearly established." *Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014) (quotation omitted). "To meet this standard the very action in question need not have previously been held unlawful." *Id.* (quotation and internal marks omitted). This is particularly true in the Fourth Amendment context, where the constitutional standard of "reasonableness" demands a fact-specific inquiry. *Mattos*, 661 F.3d at 442. The question is "whether a reasonable officer would have had fair notice

United States District Court
Northern District of California

that [the action] was unlawful[.]" *Tarabochia*, 766 F.3d at 1125 (quotation omitted).

Fundamentally, "[t]he qualified immunity doctrine rests on a balance between, on the one hand,

society's interest in promoting public officials' observance of citizens' constitutional rights and,

on the other, society's interest in assuring that public officials carry out their duties and thereby

advance the public good." *Beier v. City of Lewiston*, 354 F.3d 1058, 1071 (9th Cir. 2004).

### 2.   Fourth Amendment Claim

Count Four of Plaintiff's TAC asserts Defendants violated his Fourth Amendment right

against unreasonable seizure. TAC ¶¶ 130-36. Plaintiff alleges "Chang [and] Garcia . . . caused

immigration detainers to issue against Plaintiff," without probable cause to issue the detainer. *Id.*

¶ 133. Plaintiff also alleges the detainers caused "an unlawful deprivation of Plaintiff's liberty, in

violation of due process." [3] *Id.* ¶ 134. He further asserts that at the time these events occurred, it

was clearly established that lodging an immigration detainer against a United States citizen was a

violation of the Fourth Amendment. *Id.* ¶ 135.

The Fourth Amendment protects persons against "unreasonable searches and seizures."

U.S. Const. amend. IV. It "applies to all seizures of the person, including seizures that involve

only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873,

878 (1975). "It is well established that an arrest [or detention] without probable cause violates the

Fourth Amendment[.]" *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1076 (9th Cir. 2011)

(quotations omitted); *see also Wilson v. Porter*, 361 F.2d 412, 415 (9th Cir. 1966) (noting "the

constitutional prohibition against unreasonable searches and seizures makes no distinction

between informal detention without cause and formal arrest without cause"). "[W]hile a detainer

is distinct from an arrest, it nevertheless results in the detention of an individual." *Morales v.*

*Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015) (citing 8 C.F.R. § 287.7).

In 2007, it was clearly established that agents were required to have probable cause in

---

[3] As the Ninth Circuit noted, "ICE never had custody of Mendia, and he therefore cannot allege that the ICE detainer directly caused his confinement." *Mendia*, 768 F.3d at 1012. Nevertheless, while the immigration detainer did not directly cause any unreasonable seizure, it may have done so indirectly—namely, by rendering Plaintiff unable to secure a bail bond, among other things. *See id.*

United States District Court
Northern District of California

order to issue an immigration detainer.  First, "[t]he government has conceded for years that a detainer must be supported by probable cause."  *Id.*  The *Morales* court, citing *Cervantez v. Whitfield*, 776 F.2d 556 (5th Cir. 1985), further explained that the INS once "stipulated that a detainer 'may only be authorized . . . when the officer has determined that there is probable cause[.]'"  *Id.* (quoting *Cervantez*, 776 F.2d at 660) (alteration in the original; brackets added).  Second, the probable cause requirement is not unique to immigration detainers and is also reflected in other immigration statutes.  Pursuant to 8 U.S.C. § 1357(a)(2), immigration officers may make a warrantless arrest of "any alien in the United States, if [the officer] has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest."  Similarly, 8 C.F.R. § 287.8(c)(2)(i) provides that "[a]n arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States."  The Ninth Circuit has held that "[t]he phrase 'has reason to believe' has been equated with the constitutional requirement of probable cause."  *Tejeda-Mata v. I.N.S.*, 626 F.2d 721, 725 (9th Cir. 1980) (citing *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975), *cert. denied*, 423 U.S. 1035 (1975); *Au Yi Lau v. I.N.S.*, 445 F.2d 217, 222 (D.C. Cir. 1971)); *see also Morales*, 793 F.3d at 216 ("Courts have consistently held that the 'reason to believe' phrase in § 1357 'must be read in light of constitutional standards, so that "reason to believe" must be considered the equivalent of probable cause.'" (collecting cases)).  Finally, in *Brignoni-Ponce*, the Supreme Court considered when a "roving patrol may stop a vehicle in an area near the border and question its occupants[,]" and held that while officers need only "have a reasonable suspicion" to stop an individual to make inquiries about that person's "immigration status, . . . any further detention . . . must be based on consent or probable cause."  422 U.S. at 876, 881-82.

Plaintiff's TAC plausibly alleges Defendants did not have probable cause to believe Plaintiff was an alien and to require his detention.  Plaintiff alleges facts to show Chang and Garcia would have been aware of the fact that he was a United States citizen.  *See* TAC ¶ 39 ("As soon as the questioning of Plaintiff began, Plaintiff stated in English that he was a United States

citizen; he gave Chang and Garcia his full social security number; he informed CHANG and GARCIA that he had a United States passport last issued to him in June of 1997 in San Francisco California; and that his mother was also a United States citizen.").  Despite Plaintiff's assertions, Defendants placed an immigration detainer on him, allegedly with "no grounds . . . to believe that Plaintiff was an alien."  *Id.* ¶¶ 46, 48.  Furthermore, although ICE never assumed custody of him, Plaintiff alleges the detainer forced him to remain in pretrial detention because it rendered him unable to secure a bail bond, to seek a reduction in bail or a release on his own recognizance, or to engage in plea negotiations.  *Id.* ¶¶ 50, 52-53, 55, 58, 60.

Defendants argue "the ICE detainer was issued for the purpose of investigating Plaintiff's removability and requested that the law enforcement agency inform ICE prior to Plaintiff's release from custody so that arrangements to take him into federal custody could be made *if necessary*."  Mot. at 14 (emphasis in original) (citing 8 C.F.R. § 287.7(a) ("A detainer serves to *advise* another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency . . ." (emphasis added by Defendants)).  Regardless of what Defendants now allege was the purpose of issuing the detainer at the time, the detainer form they utilized had specific connotations and foreseeable effects.  As the Ninth Circuit explained,

> Mendia's causation theory—that the detainer led the bail bondsmen to refuse to do business with him—isn't facially implausible.  When ICE announces that it "seeks custody of an alien . . . for the purpose of arresting and removing the alien," 8 C.F.R. § 287.7(a), there's certainly a higher risk that, if released on bail from state custody, the alien might not be around to make his court dates.  *See State v. Fajardo-Santos*, 199 N.J. 520, 973 A.2d 933, 934 (2009) (lodging of detainer increased risk of nonappearance at trial, warranting increase in defendant's bail).  Whether that heightened risk was enough to lead bail bondsmen to refuse Mendia's business altogether, rather than simply to demand an increased fee, strikes us as the sort of factual issue that can't be resolved in the context of a facial attack on the sufficiency of a complaint's allegations.

*Mendia*, 768 F.3d at 1014.  At this point, Plaintiff successfully alleges a violation of the Fourth Amendment's prohibition against unreasonable seizures.

Next, as noted above, it was clearly established that law enforcement, including immigration officials, need probable cause before issuing a detainer, and Plaintiff's factual allegations show that Defendants could not have reasonably believed probable cause existed to

11

place a detainer on him.  *See Tejeda-Mata*, 626 F.2d at 725.  Moreover, although Plaintiff

continued to be detained in pretrial detention—and not by ICE or Defendants—at the time, it was

still "clearly established that a law enforcement officer is 'responsible for the natural

consequences of his actions.'"  *Morales*, 793 F.3d at 217 (quoting *Malley v. Briggs*, 475 U.S. 335,

344 n.7 (1986)); *see also Mendia*, 768 F.3d at 1015 (rejecting Defendants' argument that "the

immigration detainer can't support causation because ICE didn't 'control' the actions of the bail

bondsmen" and noting "[w]hat Mendia needed to allege is that the immigration detainer was at

least a substantial factor motivating the bail bondsmen's refusal to do business with him[.]").  As

such, the Court finds Chang and Garcia are not entitled to qualified immunity on Plaintiff's Fourth

Amendment claim.

> 3.     First Amendment Claim

Count Six of Plaintiff's TAC asserts Defendants violated Plaintiff's First Amendment right

to freedom of speech.  TAC ¶¶ 142-50.  Plaintiff alleges he "asserted his First Amendment rights

to freedom of speech by asserting his Fifth Amendment right against self-incrimination through

acts and speech[,]" and "Chang [and] Garcia . . . intended to retaliate against Plaintiff" for his

decision not to speak.  *Id.* ¶¶ 144-45.  He alleges this "desire to retaliate against Plaintiff was a

but-for cause of their actions in lodging ICE detainers against Plaintiff."  *Id.* ¶ 145.  He further

asserts that "[b]y June 15, 2007, it was clearly established that lodging an ICE detainer against a

U.S. citizen in retaliation for assertion of the First Amendment right to freedom of speech would

violate that First Amendment right."  *Id.* ¶ 149.

"[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising

the decision of both what to say and what *not* to say."  *Riley v. Nat'l Fed'n of the Blind of N.

Carolina, Inc.*, 487 U.S. 781, 796-97 (1988) (emphasis in original); *Hurley v. Irish-Am. Gay,

Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1997) ("[O]ne important manifestation of

the principle of free speech is that one who chooses to speak may also decide what not to say[.]"

(quotations and citation omitted)); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (the

First Amendment protects not only "the right to speak freely," but also "the right to refrain from

speaking at all.").

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right[.]'" *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (first brackets in original) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)) (additional citation omitted). To prevail on a First Amendment retaliation claim, "a plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (footnote omitted) (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)). A plaintiff must ultimately "'prove the elements of retaliatory animus as the cause of injury,' with causation being 'understood to be but-for causation.'" *Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012) (quoting *Hartman*, 547 U.S. at 260); *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900-01 (9th Cir. 2008) ("Plaintiff must ultimately prove first that Defendants took action that would chill or silence a person of ordinary firmness from future First Amendment activities . . . . The second requirement is that . . . Plaintiff must ultimately prove that Defendants' desire to cause the chilling effect was a but-for cause of Defendants' action." (quotation and edits omitted)); *see also Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999) ("Intent to inhibit speech, which is an element of the claim, . . . can be demonstrated either through direct or circumstantial evidence." (quotation and citation omitted)).

The next step is to determine "whether the right was clearly established . . . [by] applying an objective but fact-specific inquiry." *Inouye*, 504 F.3d at 712 (citation and quotations omitted). The Supreme Court has long recognized that "the Government may not retaliate for exercising First Amendment speech rights . . . or certain others of constitutional rank[.]" *Wilkie v. Robbins*, 551 U.S. 537, 555-56 (2007) (citing *Lefkowitz v. Turley*, 414 U.S. 70 (1973) (Fifth Amendment privilege against self-incrimination); additional citations omitted). "[T]he right in question is not the general right to be free from retaliation for one's speech[,]" but rather one that is "particularized . . . so that the contours of the right are clear to a reasonable official." *Reichle*, 132 S. Ct. at 2094 (quotations omitted) (determining the "right in question" to be the "specific right to

13

be free from a retaliatory arrest that is otherwise supported by probable cause.").

In *Bridges v. Hubbard*, the court found the plaintiff engaged in "protected conduct" for purposes of a retaliation claim "when he exercised both his First Amendment right not to speak in response to [the defendant's] questions and his Fifth Amendment right against self-incrimination." 2013 WL 3773886, at *9 (E.D. Cal. July 17, 2013), *report and recommendation adopted*, 2013 WL 5230239 (E.D. Cal. Sept. 16, 2013) (citing *Riley*, 487 U.S. at 796-98; *United States v. Bodwell*, 66 F.3d 1000, 1001 (9th Cir. 1995) ("The Fifth Amendment can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." (quotation omitted))). Similarly here, Plaintiff exercised his First Amendment right not to speak with Defendants beyond the information he initially gave them to establish his citizenship.[4]

Plaintiff also alleges plausible facts to meet the remaining prongs of a retaliation claim.  He alleges that after he refused to answer Defendants' questions, Garcia said something to the effect of "Oh! You don't want to talk?" and "We'll see if you want to talk when we're deporting your ass!"  *Id.* ¶¶ 42, 45.  Defendants placed an immigration detainer on Plaintiff that same day.  *Id.* ¶ 46; RJN, Ex. C.  And, as discussed above, Plaintiff plausibly alleges that Defendants had no grounds to believe he was an alien at that time.  *Id.* ¶ 48.  The Ninth Circuit has recognized that a retaliatory law enforcement act such as a seizure would chill a person of ordinary firmness from engaging in future First Amendment activity.  *Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013); *see also White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (holding that informal measures such as an investigation can chill First Amendment activities).  Defendants' choice to issue an immigration detainer for Plaintiff shortly after Garcia allegedly threatened him with

---

[4] Defendants challenge Plaintiff's claims related to his allegations that he asserted a Fifth Amendment right to remain silent, noting that the Court's MTA Order "finds that Plaintiff has not alleged a custodial interrogation."  Mot. at 14 n.13 (citing MTA Order at 33).  While the Court found Plaintiff's proposed TAC as then pled did not "allege a custodial interrogation" and as such could not properly assert a Fifth Amendment violation, the Court did not bar all allegations related to Plaintiff's right to remain silent.  In any event, at this time Plaintiff's First Amendment claim incorporates this right not to speak, as supported in *Bridges*, 2013 WL 3773886, at *9.

United States District Court
Northern District of California

deportation for refusing to speak satisfies the adverse action requirement.  *See Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) ("An objective standard governs the chilling inquiry; a plaintiff does not have to show that his speech was actually inhibited or suppressed . . . ." (quotations omitted)).  Finally, as to causation, Defendants' alleged threats and immediate subsequent issuance of the detainer suggest retaliatory animus, both through the content of the alleged threats and the suspect timing.  *See Bridges*, 2013 WL 3773886, at *10 (same); *see also Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) ("[T]iming can properly be considered as circumstantial evidence of retaliatory intent.").  Retaliatory motive is particularly evident where a defendant lacks probable cause, as Plaintiff has plausibly pled here.  *Cf. Ford*, 706 F.3d at 1204 n.2 (acknowledging that "[p]robable cause for the initial arrest can be evidence of a police officer's lack of retaliatory animus for subsequently booking and jailing an individual." (citing *Dietrich*, 548 F.3d at 901)).

As Plaintiff has plausibly asserted a constitutional violation for retaliation based on the exercise of his First Amendment rights, the next issue is whether the state of the law when the alleged violation took place would have given Defendants fair warning that they could not retaliate against Plaintiff for engaging in protected activity.  Here, "the state of the law at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'"  *Tolan*, 134 S. Ct. at 1866 (quotation omitted, bracket in original).  While the precise issue of a retaliatory issuance of an immigration detainer has not been addressed in this Circuit, "closely analogous preexisting case law is not required to show that a right was clearly established."  *Ford*, 706 F.3d at 1196 (quoting *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009)); *Kwai Fun Wong v. United States*, 373 F.3d 952, 975 (9th Cir. 2004) ("whether an official asserting qualified immunity may be held liable 'generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.'" (quotation omitted)).

Closely analogous law provided fair warning in June 2007 that Defendants' alleged actions were unconstitutional.  First, "by January 2006, . . . it had been clearly established that the First Amendment protected a citizen's decision both as to what to say and what not to say."  *Jackler v.*

*Byrne*, 658 F.3d 225, 243 (2d Cir. 2011); *Wooley*, 430 U.S. at 714.  Second, as early as 1995, "the prohibition against retaliatory punishment [was] clearly established law in the Ninth Circuit for qualified immunity purposes."  *See Pratt*, 65 F.3d at 806.  Third, by 2007, it was clearly established that agents were required to have probable cause in order to issue an immigration detainer, and indeed, "[t]he government has conceded for years that a detainer must be supported by probable cause."  *Morales*, 793 F.3d at 217 (citing *Cervantez*, 776 F.2d at 660, and explaining that INS "stipulated that a detainer 'may only be authorized . . . when the officer has determined that there is probable cause[.]'").  Finally, it has long been held that the right to remain silent "permits a person to refuse to answer questions, in formal or informal proceedings, where the answers might be used to incriminate him in future criminal proceedings."  *United States v. Ramos*, 685 F.3d 120, 126 (2d Cir. 2012) (citing *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984)).  Thus, based on the facts alleged, the state of the law at the time Defendants issued the detainer gave a reasonable agent in Defendants' position "fair notice" that issuing an immigration detainer without probable cause and in retaliation for Plaintiff's refusal to answer their questions after asserting his right to remain silent.  *See Tarabochia*, 766 F.3d at 1125.[5]

As such, the Court finds Chang and Garcia are not entitled to qualified immunity on Plaintiff's First Amendment claim.

### 4.    Fifth Amendment Equal Protection Claim

Count Five asserts a violation of Plaintiff's Fifth Amendment right to equal protection.  TAC ¶¶ 137-41.  Plaintiff alleges Chang and Garcia selected him for questioning due to his foreign birth and/or because his name and appearance indicates he is of Mexican descent.  *Id.*

---

[5] Defendants point out that a "reasonable immigration officer could have believed that issuing a notification detainer to investigate Plaintiff's immigration status was appropriate given his known birthplace, the dearth of confirmed information on his citizenship at the time she attempted to interview him, and his refusal at that time to provide it."  Reply at 8-9.  Defendants may ultimately be able to prove there was a "dearth" of information about Plaintiff's immigration status, as well as undermine Plaintiff's retaliatory animus claims.  But at the pleading phase, taking the plausible facts in the light most favorable to Plaintiff, the Court finds he has stated a claim for retaliation under the First Amendment, and Defendants are not entitled to qualified immunity at this time.  *See Ford*, 706 F.3d at 1196 (plaintiff "put forth facts sufficient to allege a violation of his clearly established First Amendment right to be free from police action motivated by retaliatory animus, even if probable cause existed for that action.").

United States District Court
Northern District of California

¶¶ 26, 139.  He further claims that "[b]y issuing detainers against Plaintiff solely on the basis of his race, ethnicity, and/or national origin—including his place of birth and name—Defendants Garcia [and] Chang . . . targeted Plaintiff illegally" in violation of the Fifth Amendment.  *Id.* ¶ 138.

The Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  The Amendment is "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 474 U.S. 432, 439 (1985).  The Fifth Amendment, which applies to the federal government, does not explicitly contain a similar provision.  *See* U.S. Const. amend. V.  Nevertheless, "[t]he liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."  *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013).  Thus, a damages remedy under *Bivens* is available to address violations of the equal protection component of the Fifth Amendment Due Process Clause.  *Davis v. Passman*, 442 U.S. 228, 248 (1979).

As noted above, it is unnecessary that there be a prior, on-point case with similar facts and circumstances in order to show that a right was clearly established at the time of the alleged violation, and "[t]his is especially true in equal protection cases because the non-discrimination principle is so clear."  *Elliot-Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010).  "The constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it."  *Flores v. Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980).

Defendants challenge Plaintiff's equal protection claim by "incorporat[ing] by reference the arguments made in their motion to dismiss the SAC pertaining to Plaintiff's Fifth Amendment equal protection claim[.]"  Mot. at 19.  They raise three primary challenges to a proposed Fifth Amendment claim, arguing (1) Plaintiff has not identified a protected class of which he is a member; (2) he has included no allegations that Chang and Garcia treated him differently from anyone who was similarly situated; and (3) "it is well-settled law that treating some aliens differently from others with respect to detention and removal based in part on their national origin

17

1    does not violate the Constitution."  Agents MTD at 29-30 (citations omitted).

2         To state a claim for an equal protection violation, a plaintiff generally "must show that the

3    defendants acted with an intent or purpose to discriminate against the plaintiff based upon

4    membership in a protected class." *Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001) (quoting

5    *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998)); *Maynard v. City of San Jose*, 37 F.3d

6    1396, 1404 (9th Cir. 1994) ("Intentional discrimination means that a defendant acted at least in

7    part because of a plaintiff's protected status.").  "[A] plaintiff may satisfy this showing by alleging

8    four separate elements: (1) that the plaintiff was treated differently from others similarly situated;

9    (2) this unequal treatment was based on an impermissible classification; (3) that the defendant

10   acted with discriminatory intent in applying this classification; and (4) the plaintiff suffered injury

11   as a result of the discriminatory classification." *Lam v. City & Cty. of S.F.*, 868 F. Supp. 2d 928,

12   951 (N.D. Cal. 2012), *aff'd*, 565 F. App'x 641 (9th Cir. 2014) (citations omitted).

13        According to Plaintiff, Chang and Garcia's sole grounds for issuing the detainer were his

14   race or foreign birth.  TAC ¶ 26.  If true, using Plaintiff's race or national origin as the only

15   reasons to deprive Plaintiff of his liberty "does not pass constitutional muster" under the Equal

16   Protection Clause.  *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 35 (D.R.I. 2014) (finding the

17   plaintiff, a naturalized citizen of the United States, sufficiently stated a Fifth Amendment claim for

18   violation of her equal protection rights when ICE issued a detainer based solely on her national

19   origin and Hispanic last name), *aff'd in part, dismissed in part on jurisdictional grounds*, 793 F.3d

20   208; *see also Brignoni-Ponce*, 422 U.S. at 886 ("Even if [officers] saw enough to think that the

21   [vehicle's] occupants were of Mexican descent, this factor alone would justify neither a reasonable

22   belief that they were aliens . . .").  Although Plaintiff does not explicitly allege he was treated

23   differently than others similarly situated, there is no question that the import of his allegations are

24   that ICE officials identified Plaintiff, investigated him, and treated differently than other United

25   States citizens in custody because of his race and national origin.  In other words, Plaintiff has

26   plausibly alleged that his Hispanic name, race, and national origin were the but-for causes of

27   ICE's decision to issue the detainer against him.  None of Defendants' arguments demonstrate that

28

United States District Court
Northern District of California

Plaintiff has not stated an equal protection claim.[6]

Finally, as to qualified immunity, the Court finds that a reasonable officer in Chang's and Garcia's positions would have known that using Plaintiff's race as the sole basis for his interrogation and the detainer violates the principles of equal protection.  As noted earlier, immigration detainers require probable cause, and Plaintiff has alleged plausible facts that suggest there were no grounds to believe Plaintiff was an alien, particularly as he provided Chang and Garcia with his social security number and informed them that he had a United States passport as evidence of his citizenship before they issued the detainer.  TAC ¶ 39.  It was clearly established that probable cause was needed to issue the detainer (*see above*) and further that actions based on Plaintiff's national origin and race alone were unconstitutional.  *See Flores v. Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980) ("No official can in good faith impose discriminatory burdens on a person or group by reason of a racial or ethnic animus against them.  The constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." (quotation omitted)).  Ultimately, whether Defendants acted with discriminatory animus is a question of fact; for now, Plaintiff's assertions plausibly allege that Defendants are not entitled to qualified immunity.  Accordingly, the Court finds Plaintiff states a claim for a violation of his Fifth Amendment equal protection rights.

**B.      Whether to Imply a *Bivens* Remedy**

Having found that Defendants are not presently entitled to qualified immunity on

_____

[6] Defendants cite *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 488 (1999), for the contention that "it is well-settled law that treating some aliens differently from others with respect to detention and removal based in part on their national origin does not violate the Constitution." Mot. to Dismiss SAC at 29-30.  It is unclear why Defendants cite *Reno* for this proposition.  First, their own interpretation of *Reno* is inapposite here as they identify "aliens" as the allegedly wronged party, while here there is no evidence that Plaintiff is or was an alien.  *Reno* itself states only that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation."  525 U.S. at 488.  Second, *Reno* does not stand for the proposition that national origin is an appropriate basis on which to solely base an immigration decision, as Plaintiff has alleged here.  Indeed, there are no facts that indicate Defendants based their issuance of an immigration detainer on anything aside from Plaintiff's national origin and race.

1    Plaintiff's First, Fourth, and Fifth Amendment claims, the Court turns to whether a *Bivens* remedy

2    is appropriately implied for these claims.

3         1.   Legal Standard for *Bivens* Claims

4         *Bivens* marked the first time the Supreme Court "recognized . . . an implied private action

5    for damages against federal officers alleged to have violated a citizen's constitutional rights."

6    *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (citing *Bivens*, 403 U.S. at 391).  A plaintiff

7    who asserts a *Bivens* claim therefore "seeks to hold federal officers individually liable for

8    constitutional violations."  *Starr v. Baca*, 652 F.3d 1202, 1206 (9th Cir. 2011); *see Malesko*, 534

9    U.S. at 70 ("The purpose of *Bivens* is to deter individual federal officers from committing

10   constitutional violations.").  "[A] *Bivens* action can be maintained against a defendant in his or her

11   individual capacity only, and not in his or her official capacity."  *Daly-Murphy v. Winston*, 837

12   F.2d 348, 355 (9th Cir. 1987).  "This is because a *Bivens* suit against a defendant in his or her

13   official capacity would merely be another way of pleading an action against the United States,

14   which would be barred by the doctrine of sovereign immunity."  *Consejo de Desarrollo*

15   *Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th Cir. 2007).

16        To state a *Bivens* action, a plaintiff must plead: "(1) that a right secured by the Constitution

17   of the United States was violated, and (2) that the alleged deprivation was committed by a federal

18   actor."  *Abpikar v. Sanchez*, 2013 WL 664679, at *1 (N.D. Cal. Feb. 21, 2013) (citing *Van Strum*

19   *v. Lawn*, 940 F.2d 406, 409 (9th Cir. 1991)).  That said, because *Bivens* is a judicially created

20   remedy, federal courts have been reluctant to recognize *Bivens* claims in any new "contexts,"

21   which the Ninth Circuit has construed to mean "a potentially recurring scenario that has similar

22   legal and factual components."  *Mirmehdi v. United States*, 689 F.3d 975, 981 (9th Cir. 2012)

23   ("constru[ing] the word 'context' as it is commonly used in law" (quotations omitted));  *Schweiker*

24   *v. Chilicky*, 487 U.S. 412, 421 (1988) (recognizing the Supreme Court "ha[s] responded cautiously

25   to suggestions that *Bivens* remedies be extended into new contexts.");  *see also Iqbal*, 556 U.S. at

26   675 (acknowledge that implied causes of action like *Bivens* are generally disfavored and therefore

27   their availability is limited).  Indeed, "[t]he [Supreme] Court has . . . 'recently and repeatedly said

28   that a decision to create a private right of action is one better left to legislative judgment in the

*United States District Court*
*Northern District of California*

great majority of cases.'"  *Mirmehdi*, 689 F.3d at 981 (quoting *Sosa v. Alvarez-Machain*, 542 U.S.

692, 695 (2004)); *see also Minneci v. Pollard*, 565 U.S. ___, 132 S. Ct. 617, 622-23 (2012)

(summarizing cases where Court declined to extend *Bivens*).

Thus, if a plaintiff's claim presents a "new context," courts engage in a two-part inquiry to

determine whether to extend *Bivens* relief.  *Minneci*, 132 S. Ct. at 621 ("[T]he decision whether to

recognize a *Bivens* remedy may require two steps." (citing *Wilkie v. Robins*, 551 U.S. 537, 550

(2007)).  First, the Court asks "whether there is 'any alternative, existing process for protecting the

plaintiff['s] interests.  If there is such an alternative remedy, [the] inquiry stops.  If there is not,

[courts] proceed to the next step and ask whether there nevertheless are factors counseling

hesitation before devising such an implied right of action."  *Mirmehdi*, 689 F.3d at 982 (quotations

omitted).  In other words, even absent an alternative remedy, courts should not extend *Bivens* if

there are "any special factors counselling hesitation before authorizing a new kind of federal

litigation."  *Wilkie*, 551 U.S. at 550 (quotations omitted).

Since *Bivens*, the Supreme Court has recognized implied causes of action for damages

against federal employees for only three types of constitutional violations: (1) police search and

seizure in violation of the Fourth Amendment, *see Bivens*, 403 U.S. 388; (2) gender discrimination

by a Congressman in violation of the Fifth Amendment for an employee not covered by Title VII,

*see Davis*, 442 U.S. 228; and (3) deliberate indifference toward a prisoner in violation of the Eight

Amendment, *see Carlson v. Green*, 446 U.S. 14 (1980); *see also Minneci*, 132 S. Ct. at 621-22.  In

each of these cases, the Supreme Court allowed a *Bivens* action because the Court found the

plaintiffs had no other meaningful remedies for the constitutional violations they had suffered.  *Id.*

Conversely, the Court has found that no *Bivens* remedy was available for a retaliatory employment

action in violation of the First Amendment, *see Bush v. Lucas*, 462 U.S. 367 (1983), or for the

denial of Social Security benefits in violation of the Fifth Amendment, *see Schweiker*, 487 U.S.

412, because comprehensive administrative schemes already provide meaningful redress for

plaintiffs.  *See Minneci*, 132 S. Ct. at 622.  The Ninth Circuit has observed that "[w]here Congress

has designed a program that provides what it considers adequate remedial mechanisms for

constitutional violations, *Bivens* actions should not be implied."  *Kotarski v. Cooper*, 866 F.2d

United States District Court
Northern District of California

21

311, 312 (9th Cir. 1989); *Libas Ltd. v. Carillo*, 329 F.3d 1128, 1130 (9th Cir. 2003) ("[S]o long as the plaintiff ha[s] an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability." (quoting *Malesko*, 534 U.S. at 69)).

        2.    Application to Plaintiff's First Amendment Claim

As the Court finds Plaintiff has adequately pled a violation of a right secured by the United States Constitution and that the alleged deprivation was committed by a federal actor, the Court next turns to whether a *Bivens* action is a proper remedy for this claim. *See Abpikar*, 2013 WL 664679, at *1. Defendants contend "Plaintiff's Count VI for violation of the First Amendment 'would extend the [*Bivens*] remedy to a new context' and thus triggers evaluation under *Wilkie*." Mot. at 5 (quoting *Meshal v. Higgenbotham*, 804 F.3d 417, 423, 425 (D.C. Cir. 2015); brackets in original). The Court has already addressed many of Defendants' arguments in the Order on Plaintiff's Motion to File a Third Amended Complaint. MTA Order at 17-24. Defendants' only new arguments are that there are additional special factors and recent case law they did not raise previously, which suggest a *Bivens* remedy for Plaintiff's First Amendment claim should not be allowed.[7] The Court addresses these arguments below.

First, in surveying the case law on this claim, Defendants acknowledge that the Ninth Circuit in *Gibson v. United States*, 781 F.2d 1334 (9th Cir. 1986), implied a *Bivens* remedy related to claims that federal officials retaliated for a plaintiff's political speech in violation of the First Amendment. Mot. at 4-5. But they distinguish *Gibson* on the grounds that (1) it did not consider

---

[7] Defendants also note that:

> As discussed in Defendants' motion to dismiss the SAC, the Immigration and Nationality Act ("INA") and the availability of habeas corpus offer alternative processes to address alleged constitutional violations in the context of immigration detainers. *See* Defs' Mot. to Dismiss SAC, Dkt. No. 90 at 14-21. As the Court decided the existence of an alternative existing process as to Plaintiff's claims in the SAC, Defendants will not repeat the points previously presented in their dispositive motion. *See* [MTA] Order, [] at 17-24. However, as explained below, the Court should reject Plaintiff's First Amendment claim based on special factors.

Mot. at 6-7.

United States District Court
Northern District of California

any "special factors" as the Supreme Court has recently emphasized as an important step in implying a *Bivens* remedy; and (2) the circumstances of this case are different in the sense that *Gibson* applied to routine law enforcement activities and the actual exercise of political speech. Mot. at 4-5. They also cite to a recently issued opinion by the Second Circuit Court of Appeals, *Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015), for the proposition that the Court should "declin[e] to extend *Bivens* to a new context under the First Amendment 'absent guidance from the Supreme Court.'" Mot. at 7-8 (quoting *Turkmen*, 789 F.3d at 237).

Defendants' general argument that this Court should refuse to imply a *Bivens* remedy merely because no other court has in this precise context is a non-starter. The Court cannot wait for "guidance" from the Supreme Court on this matter—the Supreme Court does not issue independent decrees but hears appeals from cases just like this one. Instead, the Court must rely on the guidance already handed down from prior appeals, which it has done thus far and continues to do. Likewise, the Court is bound to follow Ninth Circuit precedent in analyzing these claims. Finally, the Supreme Court itself has established that "federal courts have the *inherent* authority to award damages against federal officials to compensate plaintiffs for violations of their constitutional rights." *W. Ctr. For Journalism v. Cederquist*, 235 F.3d 1153, 1156 (9th Cir. 2000) (citations omitted; emphasis added). The Ninth Circuit's decision in *Gibson* indicates that a First Amendment *Bivens* claim may be cognizable,[8] and furthermore, as Defendants acknowledge, in *Hartman v. Moore*, 547 U.S. 250 (2006), the Supreme Court indicated that a *Bivens* claim could extend to First Amendment retaliation claims, although that was not the precise issue before the Court. *See Hartman*, 547 U.S. at 252 ("This is a *Bivens* action against criminal investigators for inducing prosecution in retaliation for speech. The question is whether the complaint states an actionable violation of the First Amendment without alleging an absence of probable cause to

---

[8] *Turkmen*'s decision not to imply a *Bivens* claim is distinguishable as it involved (1) "'out of status' aliens" held under terrorist charges affecting national security, and not a U.S. citizen who was in custody on United States soil and who had already been granted bail for charges of unrelated financial crimes; and (2) provided only a brief analysis of the First Amendment issue that centered on claims based on the detainees' free exercise of religion rather than exercise of free speech. 789 F.3d at 237.

1   support the underlying criminal charge. We hold that want of probable cause must be alleged and

2   proven.").  Finally, while Defendants are correct that the *Gibson* court did not analyze the precise

3   context in this case or any special factors explicitly, the Court does so here.

4        Thus, turning to Defendants' second argument, the Court considers whether, in addition to

5   the specific factors referenced in the MTA Order, Defendants raise any additional special factors

6   that suggest against implying a *Bivens* remedy.  Defendants first argue the Court should "consider,

7   as a special factor, that this case arises in the unique context of immigration enforcement, where

8   Congress and the Executive's authority is primary[.]"  Mot. at 7.  Despite Defendants' statement

9   that they would not raise issues already addressed in the MTA Order, the Court has already

10  considered this argument and rejected it.  MTA Order at 23 ("Chang and Garcia argue Congress'

11  and the Executive Branch's plenary powers over immigration matters constitute a special factor

12  that precludes the availability of a *Bivens* remedy.").  As noted in the earlier Order, the Court

13  agrees with the decision of *Lyttle v. United States*, 867 F. Supp. 2d 1256, 1270 (M.D. Ga. 2012),

14  that the issuance of an immigration detainer on a United States citizen is not a proper exercise of

15  congressional power.  MTA Order at 23.  Among other things, Defendants' reliance on Congress'

16  and the Executive Branch's power over immigration matters

> fails to make the distinction between the use of the immigration
> process to regulate the admission and removal of *aliens*, a legitimate
> exercise of the power of the political branch of government, and the
> use of that process to detain and remove *citizens*, an unauthorized
> exercise of political branch power unless additional constitutional
> protections are provided to safeguard against the wrongful removal
> of a citizen from his own country.

21  867 F. Supp. 2d at 1278 (emphasis in original).  The Court reiterated this issue throughout its prior

22  Order and finds it holds true for purposes of this Order as well.  While Defendants warn that

23  implying a *Bivens* remedy in this context could affect diplomacy, foreign policy, and the security

24  of the nation, Mot. at 8, they do not explain how those concerns are at issue when it comes to

25  implying a *Bivens* remedy to protect a United States citizen who was allegedly the subject of a

26  wrongful immigration action in retaliation for exercising his First Amendment rights.

27        Defendants' second "special factor" argument is based on the Prison Litigation Reform Act

28  ("PLRA"), 42 U.S.C. § 1997e.  Mot. at 9.  According to Defendants, in passing the PLRA,

United States District Court
Northern District of California

24

Congress sought to limit prison litigation, which was overburdening the legal system, and thus "[p]rovisions of the PLRA include total exhaustion of administrative remedies, *sua sponte* dismissal of meritless claims, and a bar on damages for mental or emotional injury absent a showing of physical injury or commission of a sexual act. *See* 42 U.S.C. § 1997e(a), (c), & (e)." *Id.* They further note that "the PLRA explicitly forecloses damages for emotional and mental injury[.]" *Id.* (citing 42 U.S.C. § 1997e(e)). Defendants argue that "because First Amendment claims generally do not involve physical injury, they for the most part do not survive PLRA review." *Id.* at 10 (footnote omitted). In their Reply, they clarify that "[t]he PLRA is instructive on whether the Court should decline to infer a *Bivens* First Amendment in the prison context, where no physical injury is alleged, because it reflects Congress' disinclination to permit such a cause of action." Reply at 6-7. But Defendants do not move to dismiss Plaintiff's claims in general under the PLRA.

The PLRA "requires that a prisoner challenging prison conditions exhaust available administrative remedies before filing suit. 42 U.S.C. § 1997e(a)." *Albino v. Baca*, 747 F.3d 1162, 1165 (9th Cir.), *cert. denied sub nom. Scott v. Albino*, 135 S. Ct. 403 (2014). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Roles v. Maddox*, 439 F.3d 1016, 1018 (9th Cir.), *cert. denied*, 549 U.S. 905 (2006). "Thus federal prisoners suing under *Bivens* . . . must first exhaust inmate grievance procedures just as state prisoners must exhaust administrative processes prior to instituting a § 1983 suit." *Porter*, 534 U.S. at 524. "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007) (citation omitted).

All of the cases cited above consider "prison conditions" generally. *See Porter*, 534 U.S. at 519 (alleging corrections officers singled plaintiff out for a severe beating, in violation of the Eighth Amendment's ban on "cruel and unusual punishments."); *Albino*, 747 F.3d at 1166

(alleging several inmates attacked the plaintiff on two occasions, by among other things, beating him unconscious, cutting him, and raping him); *Roles*, 439 F.3d at 1017 (holding the confiscation of magazines is a prison condition to which the exhaustion requirement applies); *Jones*, 549 U.S. at 207, 209-210 (one plaintiff alleged he was given a work assignment he ostensibly could not perform in light of his injuries; another alleged he was denied a single-occupancy handicapped cell, purportedly necessary to accommodate his medical condition; another alleged racial discrimination caused a disparity in internal prison punishments).  As the Ninth Circuit has recognized, "[o]ur court and others have treated various prisoner claims as challenges to prison conditions requiring exhaustion, ranging from claims of harassment by prison officials, *Bennett v. King*, 293 F.3d 1096 (9th Cir. 2002), to complaints about the availability of Spanish language interpreters, *Castano v. Neb. Dep't of Corr.*, 201 F.3d 1023 (8th Cir. 2000)."  *Roles*, 439 F.3d at 1018; *see also Preiser v. Rodriguez*, 411 U.S. 475, 498-99 (1973) (characterizing the confiscation of prisoner's legal materials as a "condition[ ] of . . . prison life"); *Gibson v. Goord*, 280 F.3d 221 (2d Cir. 2002) (requiring exhaustion for a challenge to accumulation of water in cell and exposure to second-hand smoke); *Hartsfield v. Vidor*, 199 F.3d 305 (6th Cir. 1999) (holding an allegation that prison officials violated the prisoner's equal protection rights by treating him more roughly than they treated a white inmate was one concerning a prison condition).

As Plaintiff argues, this is not simply a "case made by a prisoner complaining about prison conditions."  Opp'n at 10.  While Congress may have wanted to protect prison officials from excessive and unmeritorious litigation that could be more promptly and easily resolved through internal prison grievance procedures, there is no indication that anything in this case could have been addressed through such procedures.  Plaintiff did not sue the jail staff, nor does he allege facts indicating the jail staff had the power to rectify any of the allegations Plaintiff brings in this case.  *See Porter*, 534 U.S. at 525 ("In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation."); *Roles*, 439 F.3d at 1018 n.1 (acknowledging the opportunity for corrective action as "the PLRA's purpose").  Ultimately, Plaintiff's allegations do not really apply to the "prison conditions" but rather to acts that fall outside of § 1997e(a).  *See Porter*, 534 U.S. at

26

529 (finding it plausible that "a § 1983 claim against [a plaintiff's] arresting officer" would "fall outside of § 1997e(a).").  Consequently, the Court finds Congress's actions in regard to the PLRA do not suggest a *Bivens* remedy cannot be implied to Plaintiff's First Amendment claim—or for that matter, his Fourth or Fifth Amendment claims.

In light of the foregoing analysis and the Court's prior examination of Defendants' *Bivens* arguments, the Court finds it appropriate to imply narrow *Bivens* remedies under the claims asserted against Defendants Chang and Garcia in this case.  Plaintiff has alleged plausible allegations against Defendants to satisfy Rule 12(b)(6) at the pleading stage.  Further consideration of Defendants' arguments will be more appropriate at the summary judgment phase.

## CONCLUSION

Based on the analysis above, the Court **DENIES** Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint.

**IT IS SO ORDERED.**

Dated: May 10, 2016

_____
MARIA-ELENA JAMES
United States Magistrate Judge

United States District Court
Northern District of California